### J. M. MOSER v. THE STATE.

#### No. 3647. Decided June 23, 1915.

#### Rehearing denied October 13, 1915.

1.—Murder—Degrees—Indictment.

Where the offense was committed under the old murder statute, and the indictment comported therewith, there was no error.

2.—Same—Charge of Court.

Where, upon trial of murder under the old murder statute, the court properly charged on murder in the second degree, manslaughter, self-defense, and accidental killing, and the charge presented in a fair, full, and apt way every question raised by the testimony, there was no reversible error.

3.—Same—Charge of Court—Retreat—Other Parties.

Where, upon trial of murder, the evidence showed that certain other parties passed out of the difficulty entirely when defendant took hold of deceased, and that they had nothing further to do with the difficulty, there was nothing in defendant's contention that the court erred in not telling the jury that said other parties were not bound to retreat when attacked by the deceased, and not applying the law of retreat as to both the defendant and said other parties, as the question of retreat was wholly inapplicable to any state of facts in the case.

4.—Same—Conflict—Charge of Court.

Where, upon trial of murder, the evidence raised the issue of manslaughter, and, likewise, self-defense, and the court submitted these issues properly and completely, and wholly separate and distinct, one from the other, defendant's complaint that there was a conflict between them, so as to make them confusing, is untenable.

5.—Same—Charge of Court—Self-defense—Sufficiency of the Evidence.

Where, upon trial of murder, the court gave a clear and apt charge on the various phases raised by the evidence of self-defense, and as favorable to the defendant as was possible, and the evidence being sufficient to sustain the conviction, there was no reversible error.

Appeal from the District Court of Zavala. Tried below before the Hon. R. H. Burney.

Appeal from a conviction of murder in the second degree; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*L. Old,* for appellant.—On question of court's charge on self-defense and manslaughter: Dobbs v. State, 100 S. W. Rep., 940; Casey v. State, 113 S. W. Rep., 534; Ballard v. State, 138 S. W. Rep., 120; Henson v. State, 168 S. W. Rep., 92.

On question of court's charge on self-defense: Dodson v. State, 78 S. W. Rep., 940; Lara v. State, 89 S. W. Rep., 840.

*C. C. McDonald,* Assistant Attorney General, for the State.

PRENDERGAST, PRESIDING JUDGE.—Appellant was indicted for murder in the second degree of Morton Barnard, alleged to have been committed on or about September 14, 1912. He was convicted of manslaughter and assessed the lowest punishment.

It will be seen that this offense is alleged to have been committed prior to the Act of the Legislature doing away with the degrees of murder. The indictment is unquestionably correct under the old law and was properly preferred thereunder.

The State's first witness, Acie Stapleton, testified: "I reside in Uvalde, Uvalde County, Texas, and have known the defendant in this case for seven or eight years, and knew the deceased, Morton Barnard. I was present on the night of the 12th day of September, 1912, at the time that Morton Barnard was shot. Along about 12 o'clock of that night I went into the Hollingsworth drug store, and Morton Barnard was in there and was talking to the Cobb boys, that is, to Walter and Henry Cobb, and they were having some kind of an argument, and I got a drink of water and went on out in front, and immediately after I got out in front of the building Walter and Henry Cobb came out and sat down on the little bench in front of the store under the window, and after they had been there a few minutes, the deceased, Morton Barnard, came out, and attempted to renew the argument, and some words passed, and Henry Cobb got up and said something about leaving, but I did not understand exactly what he did say, and started off down the sidewalk, going west, with his back turned towards the deceased. At that time the deceased, Morton Barnard, was standing in front of Walter Cobb, and when Henry Cobb made the statement about going away, and started west, the deceased started down the sidewalk after him, and rushed up to him and struck at him with a knife, and Henry Cobb turned around, and the deceased backed out in the street, and the Cobb boys approached him, and the deceased still had a knife in his hand, and he rushed up to Henry Cobb and struck at him with the knife, and then rushed up to Walter Cobb and struck him with the knife. About this time the defendant in this case, Jim Moser, and Will Watkins came up from behind, and Moser grabbed hold of the deceased from behind and jerked him down, and the deceased got up on his feet, and they got into a scuffle, and were hugging and going around and around, and I heard either Moser or Watkins say: 'Give me the knife,' or 'turn the knife loose,' or something to that effect, and I heard the deceased say, 'I have already thrown the knife down,' but they continued to scuffle around, and up between the wheels of a buggy that was standing there, which belonged to the Howard boys, and after they had gotten up between the buggy wheels, Jim Moser got out his pistol, and began trying to hit the deceased over the head with it, and I saw it come up and down two or three times, and finally Moser had hit the deceased over the head with the pistol and knocked him loose

from him, and knocked him down, practically, on his knees, and as soon as he had done this he, the defendant, stepped back, and fired point blank at the deceased, and at the time that he fired the muzzle of the pistol was not more than eighteen inches from the body of the deceased. This all happened in three or four minutes. Immediately after the shot was fired, the deceased arose to his feet, and his clothes on his left breast were on fire, and Will Watkins and I began to put out the fire, and the deceased, Morton Barnard, said: 'You have killed me, and you have killed a man that never did you a particle of harm in your life.' The defendant said: 'No, Blondy, you are not hurt,' and the deceased was carried on into the drug store by myself and Will Watkins, and we got the doctor there. During the time of the struggle, and just before the deceased stated that he had thrown down the knife, I saw a white shining object fall on the ground. Of course, at the time, I did not know what it was, just simply saw it was a white object, and that it fell from some of the parties engaged in the scuffle and it fell out in front of the buggy, that is, westward from the buggy, and very near the sidewalk. This all happened in Uvalde, Uvalde County, Texas, on the 12th day of September, 1912, and the deceased died some three or four days after that. in a hotel at Uvalde, Uvalde County, Texas."

Cross-examination: "I can say that there was plenty of light there for me to see all that was going on. There was the street light right across the street at Rice's corner, and there was also some light coming from the lamps in Hollingsworth's drug store, and I could see everything that was going on, and I say positively that I saw a white object fall towards the west of the buggy. I do not remember that I testified before that I saw the knife fall east of the buggy, but if I did, I got my directions mixed up. Yes, it is a fact that up to the time that the deceased cut at Cobb on the sidewalk with the knife, that no one had made any assault upon him, and no one had done or said anything to him to make him mad. Yes, it is a fact that he seemed mad about something, and it is a fact that he rushed up behind Henry Cobb as he was going away from him. Yes, it is a fact that this is the first that I knew that there was going to be any fight. Yes, it is a fact that I heard one of the Cobb boys say out in the street, after the deceased had already struck at Henry, 'Boys, somebody give me a club, he has a knife.' Yes, it is a fact that at the time that the defendant grabbed hold of the deceased he had already cut at Henry Cobb with the knife on the sidewalk, and had already cut at Henry Cobb out in the street, and at the time he was seized hold of by the defendant, he was in the act of cutting at Walter Cobb with the knife. Yes, the defendant in this case was deputy sheriff of Uvalde County at the time, and was also night watchman, and Will Watkins, who was with him at the time, was also deputy sheriff."

Redirect examination: "No, I never heard either Will Watkins or the defendant in this case call upon the deceased to submit to arrest, and I never heard either one of them tell him that they were trying to

arrest him. There was nothing whatever said about an arrest—just grabbed hold of him, but at the time that the defendant jerked the deceased down, I heard someone say, 'Look out, he has got a knife,' and then I heard someone say, 'I have handled lots of worse men than he is many a time.' "

The State introduced other witnesses who testified substantially as did Stapleton. The knife of the deceased was found after the shooting about where Stapleton said he saw it dropped. It was identified, produced on the trial, and introduced in evidence.

Dr. Myrick testified that he was called to deceased immediately after the shooting and reached him very soon; that he was bleeding profusely from a gunshot wound, which entered his left side about three inches above the left nipple; the ball ranged downward and backward and its exit was in his back, left of his kidney about twelve or fourteen inches below the place of entrance. The wound was made with a large caliber pistol and it was fatal. Deceased died therefrom a few days later.

The appellant's side of the case is fairly presented by the testimony of Will Watkins, said officer, who was with him at the time he shot deceased. He testified:

"The shooting occurred in Uvalde, right in front of the Hollingsworth drug store, between 11 and 12 o'clock on the night of the 12th day of September, 1912. At the time I was deputy sheriff of Uvalde County, and was also night watchman of the town of Uvalde, both of us being salaried officers. On that night, between 11 and 12 o'clock, the defendant and I were across the street from what is known as the Hollingsworth drug store corner, and we heard some loud wrangling, and heard some cursing, and heard someone whom we afterwards found to be the deceased, Morton Barnard, using the words: 'God damned,' and we got up and started across the street to see what the trouble was, and when we started the deceased was in sight of us, but just immediately after we started we heard footsteps going down the cement sidewalk in a western direction, and saw the deceased start towards the direction in which the steps were going, and he passed from our view, but we kept going, and he did not go upon the sidewalk for four or five seconds after the deceased disappeared he came back into our view out into the street, and he made a run at Henry Cobb, and struck at him with a knife, and then turned and made a run at Walter Cobb and struck at him with a knife, and just at the time that he was in the act of striking at Walter Cobb with a knife, the defendant in this case, Jim Moser, seized hold of him from the side, and pulled him backwards, and I was on the other side of him, and stepped between him and the Cobb boys. When the defendant in the case pulled him backwards, he very nearly jerked him down, and the right hand of the deceased struck the ground, and I saw in his hand at the time a large pocketknife with the blade open, and I said to the defendant: 'Look out, Jim, he has got a knife,' and the deceased immediately jumped up and seized hold of the defendant and caught him around the neck, and hugged him up close to him, and began trying to cut him with the knife, which was

in his right hand, and they struggled around for a minute or so, and got up between the buggy wheels of the buggy, which belonged to the Howard boys, which was there, and after they had gotten up there, the deceased got Moser some way around the neck and throat, and pulled his head around to one side and up, and Jim said: 'Hit him, Bill, he is choking me,' and again repeated the words: 'Hit him, Bill, he is choking me.' In the meantime I had seized hold of the right hand of the deceased in which the knife was, and the deceased was struggling with this hand, trying to get it loose, and trying to cut Moser with the open knife that he had in his hand, and when Moser said the second time to 'Hit him, Bill, he is choking me,' it sounded like he was choked, and immediately the second after he said that the deceased said: 'I have got one of the God damn sons of bitches now.' Up to this time Moser had never drawn his pistol, but the deceased had been trying to cut him with the knife, and about the instant that the deceased made this remark I saw Moser's pistol come up and come around over the arm of the deceased in some way, and was fired, and at the time it was fired the muzzle of the pistol was right against the deceased and set his clothes afire, and at the time that it was fired, they were both hugged together by (between?) in the buggy wheels, very close to each other, and the defendant did not step back and shoot the deceased, nor did he hit him with the pistol and knock him down on his knees. When the shot was fired both the deceased and the defendant turned loose of each other, and the deceased walked around to the west in front of the horse and buggy belonging to the Howard boys, and went up on the sidewalk, and his clothes were on fire at the time from the shot, and the defendant and myself put out the fire. Yes, at the very time that the shot was fired the deceased had in his right hand an open knife, and was trying to cut the defendant with it, and he was surging this right hand forward in the direction of the defendant, and all the time he had the knife in his hand continually from the time that Moser took hold of him until the time that the shot was fired, but I do not know what became of the knife after the shot was fired."

Cross-examination: "Yes, it is a fact that I had hold of the deceased from the time that Moser caught him, and from the time that he seized Moser around the neck until the shot was fired, and it is a fact that he had the knife in his hand all the time. I did not get up between the wheels of the buggy, but was standing on the outside of the wheels, holding his right arm. Just at the instant that the shot was fired I let go his right arm, with one hand, and reached up and caught hold of the hand that was on Moser's throat, and gave it a jerk, and just as I did that Moser gave his head a jerk, and just at the instant that the shot was fired they came apart, but the two actions occurred at the same instant, but I never let go my hold of his right arm, the hand in which the knife was at any time after I got hold of it until the shot was fired. Yes, it is a fact that neither Moser nor myself called upon the deceased to surrender, and we did not even tell him that we were

going to arrest him, nor tell him what we wanted—just seized hold of him and the struggle began."

Redirect examination: "At the very time that the defendant, Moser, seized hold of the deceased, he was in the act of striking at Walter Cobb with a knife, and there was not time to do or say anything, but during the struggle I heard Moser say to the deceased: 'Give me that knife,' and the deceased said: 'I will give you nothing.'"

The court charged on murder in the second degree, manslaughter, self-defense and accidental killing. It presented in a fair, full and apt way every question raised by the testimony and is subject to none of appellant's attacks upon it.

Appellant attacked various paragraphs of the charge, numerously. We deem it unnecessary to discuss them separately—except such as appellant mentions in his brief. In his first, he contends the court erred in not telling the jury that the witnesses Walter and Henry Cobb were not bound to retreat when attacked by deceased. This was wholly unnecessary. The testimony conclusively shows that they passed out of the difficulty entirely when appellant took hold of deceased, and they had nothing whatever further to do with the deceased, nor did deceased have anything further whatever to do with them.

His next complaint is that the court erred in not applying the law of retreat as to both the defendant and the said Cobbs. What we have said about the Cobbs above equally applies here. The question of retreat was wholly inapplicable to any state of facts in this case, as shown by the two theories of the case in the above stated testimony.

The evidence clearly raised the issue of manslaughter and likewise self-defense. Both issues were fully and completely submitted, wholly separate and distinct one from the other, by the court's charge, and appellant's complaint that there is a conflict between them so as to make them confusing is entirely untenable.

Appellant's attack of various paragraphs of the court's charge on self-defense is without merit. The court gave a clear and apt charge on the various phases raised by the evidence of self-defense and every way as favorable to appellant as the evidence on any issue called for or raised. It is unnecessary to take up each of these attacks separately.

We have carefully considered the evidence, charge of the court and each of appellant's attacks thereon. No error was committed in the trial of this cause. The evidence amply sustained the verdict and the judgment is affirmed.

*Affirmed.*

[Rehearing denied October 13, 1915.—Reporter.]